UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,       )
                                  )
                 Plaintiff,    )  Case No. CR 10-133
                                  )  Milwaukee, Wisconsin
    vs.                         )
                                  )  January 21, 2011
AMANI BOOKER,                 )  1:35 p.m.
                                  )
                 Defendant.    )  **ELECTRONICALLY RECORDED**

---

## AUDIO FILE TRANSCRIPTION OF SENTENCING HEARING
### BEFORE THE HONORABLE CHARLES N. CLEVERT, JR.
### UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff
UNITED STATES OF AMERICA:    Office of the US Attorney
                            By: JOSEPH R. WALL
                            517 E Wisconsin Ave - Rm 530
                            Milwaukee, WI 53202
                            Ph: 414-297-1700
                            Fax: 414-297-1738
                            joseph.wall@usdoj.gov
For the Defendant
AMANI BOOKER:               Federal Defender Services of
(Present)               Eastern Wisconsin, Inc.
                            By: BRIAN P. MULLINS
                            517 E Wisconsin Ave - Rm 182
                            Milwaukee, Wisconsin 53202
                            Ph: 414-221-9900
                            Fax: 414-221-9901
                            brian_mullins@fd.org

U.S. probation office:     JAMES P. FETHERSTON (414) 297-1736

U.S. Official Transcriber:   JOHN T. SCHINDHELM, RMR, CRR,
                              johns54@sbcglobal.net

Proceedings recorded by electronic recording,
transcript produced by computer aided transcription.

1               TRANSCRIPT OF AUDIO FILE

2                    JANUARY 21, 2011

3                1:35:28 p.m. - 2:42:52 p.m.

4                       *    *    *

5          THE BAILIFF:  Please be seated.

6          THE CLERK:  This is United States of America vs. Amani

7  Booker, Case No. 10-CR-133 here for a sentencing.  May I have

8  the appearances, please.

9          MR. WALL:  Joseph Wall for the United States.  Good

10  afternoon, Your Honor.

11          THE COURT:  Good afternoon.

12          PROBATION OFFICER:  Good afternoon, Your Honor.  Jim

13  Fetherston from Probation.

14          THE COURT:  It's good to see you.

15          MR. MULLINS:  Good afternoon, Your Honor.  Brian

16  Mullins appears in behalf of Amani Booker who also appears in

17  custody.

18          THE COURT:  Good afternoon to each of you.

19          Mr. Booker, as you know, you entered a guilty plea in

20  this courtroom on the 20th of September of last year and the

21  court directed that a presentence report be prepared.  That

22  report has been tendered, and I'd like to know if you've had a

23  chance to go over the presentence report and discuss it with

24  Mr. Mullins.

25          THE DEFENDANT:  Yes, sir.

2

1        THE COURT:  Are there any other matters you need to

2    review with your attorney before we begin today?

3        THE DEFENDANT:  No, sir.

4        THE COURT:  Mr. Mullins, at this juncture I note that

5    you have objected to the defendant receiving a two-level

6    increase under 3B1.1(c) of the guidelines.

7        MR. MULLINS:  Correct, Your Honor.

8        THE COURT:  Do you continue with that objection today?

9        MR. MULLINS:  We do, Your Honor.

10        THE COURT:  Do you wish to be heard?

11        MR. MULLINS:  Yes, Your Honor, just in reply to the

12    probation office's response.  I think the probation office

13    focuses on the overall conduct of Mr. Booker's relationship with

14    Miss Arnold.  And I don't think that is relevant to determining

15    Mr. Booker's -- whether Mr. Booker played a leadership role in

16    the offense for which this court is sentencing him, which is

17    trafficking of a minor in sexual activity.

18        Strictly related to that offense, I believe Miss

19    Arnold and Mr. Booker were equal.  Mr. Booker did not direct

20    Miss Arnold, for example, to solicit the victim in this case who

21    I will refer to as "Sapphire" as the government did yesterday at

22    Miss Arnold's sentencing.  Mr. Booker did not direct Miss Arnold

23    to solicit "Sapphire;" he did not direct Miss Arnold to instruct

24    "Sapphire" on techniques which the evidence shows she did on her

25    own; and, he did not direct Miss Arnold to, for example, collect

1    a certain portion of money from "Sapphire."

2        Miss Arnold certainly played a major role, in part, in

3    getting "Sapphire" to participate in the activity for which both

4    Miss Arnold and Mr. Booker are being sentenced.

5        Miss Arnold contacted customers from her telephone.

6    She did ask the victim of her age five times.  She, I think you

7    could say, recruited the victim in the case to join her and

8    Mr. Booker because she suggested to the victim that only earning

9    $50 was not enough; that she could earn more if she were to join

10   up with Mr. Booker and Miss Arnold.  There's no evidence that

11   Mr. Booker told Miss Arnold to recruit the victim in this way.

12   So I don't think Mr. Booker played any role above that which was

13   played by Miss Arnold.

14        The probation office cites United States vs. Young to

15   support the enhancement in this case, but I think the facts of

16   each case are different.  In Young the defendant was charged and

17   sentenced for using the facilities of interstate commerce to

18   facilitate prostitution.  And there, the court observed that the

19   defendant in that case was more or less the manager of a massage

20   parlor, was divvying out wages, was reporting to the owner of

21   the massage parlor when employees were misbehaving, was

22   assigning customers to different masseuses.  So I think in that

23   case, and for the offense that that defendant was charged with,

24   the evidence is much more clear-cut that she was playing a

25   manager role.

1    But here, for strictly the offense for which

2 Mr. Booker is being sentenced today, Mr. Booker played no

3 additional role that Miss Arnold did not play and, therefore, he

4 should not be given points for a leadership role.

5    That's all we have on that issue.

6    THE COURT:  Mr. Wall?

7    MR. WALL:  Your Honor, I have to agree.  There's not

8 enough evidence in the record to support that supervisory

9 enhancement.  And I will say, based on facts that I know are not

10 on the record, that there is -- that's not the case.  In other

11 words, I don't think Mr. Booker supervised Holly Arnold as to

12 this offense conduct here that's in front of the court.

13    I think in this case both Holly Arnold and "Sapphire"

14 were simply prostitutes of Mr. Booker.  And I don't know of any

15 directions that Mr. Booker gave to Holly Arnold that she was

16 supposed to give to "Sapphire."  Again, in the record, out of

17 the record, it seems like when Holly Arnold and "Sapphire" were

18 together alone, Holly Arnold did give her some directions.

19 There's just not enough here and I don't think the court should

20 apply the enhancement, with all respect to Mr. Fetherston.

21    THE COURT:  One moment, please.

22    Mr. Fetherston, are there some facts in the record

23 that you look to in support of the enhancement discussed in the

24 presentence report and, in particular, the addendum which

25 addresses the defendant's objection?

1        PROBATION OFFICER:  Yes, Your Honor.  Those facts are

2  outlined in our response.  But just to highlight, the

3  relationship between -- the way we looked at it -- between Amani

4  Booker and Holly Arnold was that of pimp and prostitute, to put

5  it in very blunt terms.  And I believe Miss Arnold, even in her

6  statements to law enforcement, acknowledged that she was in an

7  underling role, that she worked for Amani Booker.  Therefore,

8  those activities that she undertook with "Sapphire" in the hotel

9  room in the weekend in 2010 would have been for Mr. Booker.

10        There's also factual information from the presentence

11  report that Mr. Booker did have a claim to a share of the

12  proceeds here and a larger share than the women that were

13  prostituting for him.  That's evidenced with Miss Arnold's

14  statements regarding the laptop computer that the defendant

15  purchased using money she had earned as a prostitute.  And then

16  some other information that's submitted in the written record

17  support our position.

18        In turning to the case <u>United States vs. Young</u>.  While

19  that case is not directly on point, I think the Seventh Circuit

20  addresses the issue of leadership role in basically saying that

21  an individual orchestrating or coordinating the activities of

22  others, it can be considered for the two-level enhancement under

23  3B1.1(c).

24        THE COURT:  I'd like for counsel to address the facts

25  underlying the offense, particularly as they relate to what

1    transpired after the young woman was approached and taken to the

2    hotel.

3          MR. MULLINS:  Well, Your Honor, my understanding is

4    that she went to the hotel.  They took her to the hotel, she

5    showered.  I believe Mr. Booker asked her to shower.  And then

6    Mr. Booker took some photos of her which were posted on the

7    Internet.  And then Miss Arnold used her contacts in her cell

8    phone to contact her customers and try to solicit what I believe

9    the discovery refers to as prostitution dates.

10          Eventually, she advertised the fact that two women

11   would be present, or a minor and a woman would be present.  She

12   didn't advertise that it was a minor, she advertised that two

13   women would be present.

14          And eventually -- I believe the evidence is a little

15   bit disputed as to how many customers came, but I will concede

16   that perhaps two customers engaged in sexual relations with the

17   victim, with "Sapphire," and that the money in those -- as a

18   result of those transactions was essentially divided among the

19   three.  It's unclear to me from the evidence in the record how

20   the money was divided.

21          And so that's, I think, the summary of my

22   understanding of the evidence as to what transpired after the

23   victim went to the motel.

24          THE COURT:  Mr. Wall, do you disagree with anything

25   that was just stated?

1       MR. WALL:  Yes.  In the discovery it's pretty clear

2  that the money all went to Mr. Booker, which is the nature of

3  the relationship.  Miss Arnold always gave her money to

4  Mr. Booker.  I believe all that's in the discovery.  And I think

5  "Sapphire" here actually saw that happening.  And I believe

6  that's in the discovery too.

7       But that's, you know, Judge, that's just part of the

8  relationship.  That's how this works.  There's not a division of

9  the money.  And I think that the fact that the money went to

10  Mr. Booker is -- doesn't support the enhancement at all.  It

11  just shows, as I was saying earlier, that these are his

12  prostitutes.  This is the relationship.  And they make money and

13  they give it to Mr. Booker.  Mr. Booker was the driver of the

14  car.  He was the one who approached "Sapphire" on the street.

15  Really, Miss Arnold's participation in that, by her own

16  admission, is that she asked "Sapphire" five times how old

17  "Sapphire" was, and Mr. Booker asked three times, but she never

18  said "Mr. Booker told me to ask her."

19       Mr. Booker told this "Sapphire" that if she

20  prostituted for him she could have anything she wanted, just

21  like Holly Arnold had.  That was his statement, part of the

22  enticement.  He's the one who took her to a hotel room.  As I

23  recall, he's the one who paid for the hotel room.  He gave

24  "Sapphire" the marijuana to smoke.  He took the nude photos of

25  "Sapphire."  He used his computer to post those photos to the

8

1    Internet.  And, as I say, he received the cash proceeds.

2          There's just not enough here, Your Honor.  Quite

3    frankly, if there's a finding here, I can't support it on

4    appeal.  It's just not here.

5          THE COURT:  Now, I note the application notes, and, in

6    particular, note 2 indicates in the last sentence:

7          "An upward departure may be warranted, however, in the

8    case of a defendant who did not organize, lead, manage, or

9    supervise another participant, but who nevertheless exercised

10   management responsibility over the property, assets, or

11   activities of a criminal organization."

12          I would gather that you and the defense would first

13   conclude this is not a criminal organization.  But even if it

14   might be considered a criminal organization, what Mr. Booker

15   engaged in was not general management but, rather, he acted

16   consistent with a custom or practice based on his relationship

17   with his co-defendant.  Is that a fair and accurate assessment?

18          MR. WALL:  I agree with the court.  I mean, he's

19   essentially an employer and they're two employees and neither

20   employee is supervising the other employee.  They're just

21   working for him.

22          MR. MULLINS:  And I acknowledged in our objection that

23   application note 2 might be applicable in this circumstance, so

24   I would agree with the court's analysis.

25          I did want to just address the probation office's kind

1   of reference to the computer.  I don't necessarily see that as

2   showing that Mr. Booker played any leadership role.  The

3   computer was an essential tool of the criminal enterprise.

4   Whether it was an enterprise of two, three, it was certainly an

5   essential tool.  The money that the criminal enterprise gained

6   was used to invest in a tool that was necessary to continue that

7   enterprise.  So I think the fact that these proceeds were used

8   to buy a computer doesn't necessarily show that Mr. Booker

9   played any leadership role.

10          THE COURT:  While I do agree with the assessments of

11  counsel, I certainly do see facts in this record upon which it

12  could be suggested that Mr. Booker is to be assessed two points,

13  particularly the fact that the relationship of Mr. Booker and

14  Miss Arnold was one which involved him enlisting her to engage

15  in prostitution and during the course of their joint activities

16  he did take the lion's share of what was earned.  And he was the

17  person in this particular instance who approached the child

18  victim and enlisted her to work as a prostitute.

19          However, other facts show that Miss Arnold also

20  influenced the child to make the decision to work as a

21  prostitute, as pointed out.  In particular, she did query the

22  14-year-old about her age, and directed the 14-year-old

23  regarding how to conduct herself during their dates.

24          And so there was more -- there was divided

25  responsibility here, notwithstanding the fact that Mr. Booker

1  was somewhat dominant in his relationship with Miss Arnold.

2          On the basis of these findings which support the

3  defendant's objection that the court not apply a two-level

4  enhancement under U.S. Sentencing Guideline 3B1.C, the court

5  does sustain the defendant's objection and determines that the

6  enhancement should not be assessed.

7          That having been said, are there other objections that

8  the defendant wishes to assert at this time?

9          MR. MULLINS:  No, thank you, Your Honor.

10         THE COURT:  Are there any objections by the government

11 which have not already been articulated?

12         MR. WALL:  No, Your Honor.

13         THE COURT:  The court, therefore, finds the facts in

14 the presentence report should be adopted as its findings of

15 fact.

16         The court is also sustaining the objection to the

17 enhancement and, as a consequence, the defendant is placed at a

18 criminal history category V, with a total offense level of 31,

19 assuming that the government is supporting three points for

20 acceptance of responsibility.

21         MR. WALL:  We are, Your Honor.

22         THE COURT:  I do believe that the request for three

23 points is warranted and, therefore, on the basis of that

24 request, which the court grants, the defendant is at offense

25 level 31 which translates into an advisory guideline of from 168

1  to 210 months.  The fine range goes from $15,000 to $150,000.

2  And, inasmuch as one count is involved here, the Mandatory

3  Victims Restitution Act calls for an assessment of $100.

4       If no further objection is heard and the parties do

5  not take exception to the findings as stated, we'll proceed to

6  the next phase of sentencing.  Mr. Wall?

7       MR. WALL:  Thank you, Your Honor.  I'll start out by

8  advising the court of something positive here, and that is that

9  Mr. Booker did sit down with law enforcement, I believe it was

10  last week, and give a full statement regarding his knowledge of

11  some other criminal activity in the Milwaukee area that may end

12  up being helpful.  I don't know if it will.  As of right now

13  it's just a statement.  It could develop into something, and

14  maybe Mr. Booker will be back in front of this court for some

15  type of sentence reduction.  But the important thing is that by

16  making a statement I think an individual shows an even stronger

17  acceptance of responsibility.  So that is something positive.

18       And I'm going to shift now to the statutory factors.

19  First, 3553(a)(1), you look at the nature of the offense.

20  Really, next to physical violence this is some of the most

21  serious conduct sanctioned by the federal criminal code.

22  Mr. Booker enticed a child to join his prostitution business.  I

23  believe he knew this "Sapphire" was under 18.  Whether he knew

24  she was 14, 15, 16, or 17, I don't know.  I don't think he cared

25  one bit.  But I think he knew she was underage.  Again, he and

1  Holly Arnold asked her a total of eight times how old she was.

2  You don't do that if you believe someone when they say "I'm 18."

3  And I would note that neither one of them -- Mr. Booker in

4  particular -- did not even take the simple step of asking

5  "Sapphire" for her ID or a driver's license.  And again, that's

6  because he just didn't care.

7          What mattered to him on the street, as he was

8  recruiting her, was that he was now going to be able to

9  advertise a two-girl special on his prostitution Internet site.

10  Very, very serious conduct.

11          As part of this enticement here, Mr. Booker told her

12  that, "Sapphire," that if she prostituted for him she could,

13  quote, "have anything she wanted," unquote, just like Holly

14  Arnold had.  That was a lie.

15          Mr. Booker is the one who took this child to a hotel

16  room where she would both be sleeping and having sex with

17  strange men.  Amani Booker gave this child marijuana to smoke.

18  Amani Booker took nude photos of this child, including photos

19  that displayed her genital area.  Mr. Booker used his computer

20  to post these photos to an Internet site to advertise this

21  child's sexual services.  And Mr. Booker is the one who received

22  the cash proceeds from this child's sex acts with the clients

23  that were found on the Internet and others.

24          That's the nature of the offense.  Extremely serious

25  crime.  Extremely serious conduct within the time itself.

1       Under 3553(a)(1), we also look at the background and

2  the character of the defendant.  And there's not a lot of good

3  things to say here based on the facts in the presentence report.

4  And that's unfortunate.  That's an unfortunate thing for me to

5  say.  What we have here in his background is a series of

6  unbroken criminal convictions since he was 17 years old,

7  including some very serious crimes.

8       We have a second-degree recklessly endangering safety

9  while armed in 1995 that earned him three years in prison.  The

10  offense conduct is that he fired a shot from a handgun that

11  struck the victim's forehead, and then the slug wrapped itself

12  around and ended up in the victim's back.  He gets paroled from

13  that sentence, and then he's revoked because of new criminal

14  conduct.

15      In 2004 we have another serious felony.  And

16  in-between there are other crimes, but there's three that really

17  do stand out.  And in 2004, possession with intent to distribute

18  cocaine.  Extremely serious crime.  Terrible, terrible drug.

19  Again, he earned a prison sentence through his conviction there.

20  And then about a year ago we have this domestic battery, bodily

21  harm.  The victim was one of his prostitutes who told law

22  enforcement that Mr. Booker frequently beat her.  In this

23  particular instance she was trying to flee from Mr. Booker and

24  from his prostitution business.  She was trying to get away from

25  this.  And she had been in the business with Mr. Booker for five

1   years.  She stated that she cut her hand when he thrust a knife

2   at her stomach and she grabbed the knife.  Again, very serious

3   conduct resulting in this conviction.

4        Again, looking at his background, we look at paragraph

5   24 of the presentence report.  Mr. Booker says he wants this

6   court to know that the entire 10 years he was out prostituting

7   women he was, quote, "always looking for a way out," unquote.

8   That's not true, because we know from paragraph 79 to 81 in the

9   PSR that he has absolutely no verifiable history of working an

10  honest job.  We also know that he's never had to file an income

11  tax return from paragraph 85 of the presentence.

12       THE COURT:  Never had to file an income tax return?

13       MR. WALL:  Never did and probably never -- never did,

14  Your Honor.  That's a better way to put it.  He never filed an

15  income tax return.

16       He admits that he started prostituting women more than

17  10 years ago.  He said it was easy and quick money.  He admits

18  to earning, in quotes, "up to a thousand dollars a night."  But

19  we know that he actually earned nothing.  It was the women he

20  prostituted who earned this money and handed it over to

21  Mr. Booker, just as they were instructed to do.  He prostituted

22  Holly Arnold for five years.  In 2010 alone we found 55 separate

23  Internet advertisements for Miss Arnold's prostitution services.

24       And he had a good number of other prostitutes working

25  for him during the time period that Miss Arnold was also his

15

1  prostitute. We found on a PDA — personal digital assistant I

2  believe it is — file folders — it's a mini-computer — and the

3  folders were labeled with what appeared to be street names of

4  women, rather exotic names, such as "Sapphire." And in each one

5  of these files were photos of nude women which Miss Arnold tells

6  us were his other prostitutes or previous prostitutes over the

7  years. So this is really what we have here in the background of

8  this defendant. Not good.

9       In terms of sentencing, Your Honor, and the goals of

10  the sentence under 3553(a)(2), consistent with the plea

11  agreement my recommendation to the court is 14 years

12  imprisonment, no fine, five years of supervised release. I look

13  at this in terms of the purpose of the sentence as a general

14  deterrence case, and I believe that that should be the goal of

15  your pronouncement here today as to Mr. Booker.

16       I urge you, through your comments and the sentence you

17  give to Mr. Booker, to tell the community that any men who have

18  any inclinations like Mr. Booker has had, and in fact has acted

19  on, that there is a very serious punishment for getting involved

20  in this dirty destructive business. I ask that you send a

21  message of deterrence that this business destroys the lives of

22  some of the most vulnerable members of our community — women and

23  children from broken homes, women and children without good male

24  role models in their lives, women and children who involve

25  themselves in the most humiliating conduct imaginable and not

1    imaginable, just so they can hear at the end of the day, as

2    Miss Arnold did, the hollow, manipulative, dishonest words "I

3    love you."

4         Mr. Booker himself in paragraph 24 of the PSR admitted

5    that he was, quote, "taking advantage of women who wanted to

6    make bad decisions," unquote.  I doubt very much that these

7    women really wanted to spend their days making bad decisions.

8    Once a woman has been turned out into the street by a sex

9    trafficker like Mr. Booker, there's really no going back.  The

10   nightmares and memories, the debasement, are life-long, and I

11   would posit that psychological damage too will never go away.

12        Thank you.

13        THE COURT:  Mr. Mullins?

14        MR. MULLINS:  Thank you, Your Honor.  We're asking for

15   a sentence of 120 months which is the statutory mandatory

16   minimum in this case.  We believe 120 months is a significant

17   sentence for Mr. Booker, given that Mr. Booker's longest prior

18   term of imprisonment was 36 months.  So this would be more than

19   three times greater than any term of imprisonment he has served

20   before, and that is certainly a factor when the court is

21   considering specific deterrence.

22        And the reason we believe that a variance from the

23   guidelines is appropriate in this case — even though I do think

24   120 months is a extremely significant sentence — but I think a

25   variance is appropriate in this case because I don't believe

17

1    that this case is really the heartland of sex trafficking in

2    children and what the guidelines are necessarily getting at when

3    they impose pretty high base offense levels for sex trafficking

4    in children.

5            The evidence shows, and I think it's undisputed, that

6    "Sapphire" was prostituting before she met Mr. Booker.  And she

7    was attempting to prostitute herself when Mr. Booker and

8    Miss Arnold came upon her on 17th and North in the middle of the

9    night.  So this is not a case where Mr. Booker lured someone who

10   was, for example, a runaway who had never engaged in

11   prostitution before and lured them into the prostitution world.

12   And I think that is one of the reasons that the base offense

13   levels in these cases are so high, is that they are directed at

14   activities like that, which is very common.  Runaways constitute

15   a large percentage of the prostitutes out there.  And this is

16   not a case like that.

17           The victim in this case also, I think it has to be

18   considered, looked older than she was.  And we have a report

19   from a pediatrician, Dr. Wyatt, verifying that to any layperson

20   they could not tell with any reasonable degree of certainty that

21   "Sapphire" was under 18 -- or under 21, let alone under 18.

22           THE COURT:  Let me stop you there to ask whether you

23   are asserting that for mitigation purposes or indirectly

24   attacking whether or not your client fits within the statute of

25   which was the basis for his conviction.

1      MR. MULLINS:  We are asserting it for mitigation

2  purposes.  I was not on this case when Mr. Booker made the

3  decision to plead guilty, but I have reviewed the notes from

4  that time from Mr. Wilmouth who was representing Mr. Booker at

5  the time.  I have spoken with Mr. Wilmouth personally about this

6  issue and a decision was made that the fact that Mr. Booker did

7  not believe she was under 18 is not a defense to the charge the

8  way that the statute is written.

9      THE COURT:  And the statute as written indicates that

10 if you have a chance to see the child involved, then you may be

11 found guilty, correct?

12     MR. MULLINS:  Correct.  And we don't dispute that

13 Mr. Booker had a chance to view the victim in this case.  And I

14 have discussed this issue with Mr. Booker.  I discussed it with

15 him today.  I think, frankly, that Mr. Booker probably disagreed

16 with Mr. Wilmouth's analysis of the case originally, but I

17 believe that despite the fact that I don't think Mr. Booker

18 necessarily believes the law is just, agrees that it is what the

19 law is.

20     THE COURT:  Mr. Wall, do you wish to address the

21 latter points of the defendant's comments?

22     MR. WALL:  Well, I will repeat a little bit what I

23 said yesterday:  That I charged this case -- subsection (c) of

24 the amendment from December of 2008 kind of slipped by me.  I'm

25 embarrassed to say that, but it did.  I charged this case under

1   the reckless disregard of the fact that she was a child.  And I

2   believed then -- I was certain then that these two knew that and

3   didn't care about it, and I believed beyond a reasonable doubt

4   that I could prove that to a jury once "Sapphire" got on the

5   witness stand.

6           I do believe that subsection (c) as amended does apply

7   to this case, and that Mr. Mullins' comments really hit the mark

8   that Mr. Booker, while he may not agree with the law or think

9   that it is just, Mr. Booker did, in fact, have an opportunity to

10  observe "Sapphire" and, therefore, we don't even have to prove

11  that he knew she was under 18.

12          THE COURT:  Mr. Mullins, are there additional comments

13  you would like to make?

14          MR. MULLINS:  Yes, Your Honor.  As I was saying,

15  Dr. Wyatt's report concludes that a layperson could not

16  determine whether "Sapphire" was under 21, let alone 18.  So I

17  think that is also a factor that takes this case outside the

18  heartland of the guidelines.  This is not a situation where it

19  was obvious to anyone that the victim was under 18.

20          Also -- and this is where I would take issue with the

21  government's characterization -- or one of the areas where I

22  would take issue with the government's characterization of the

23  facts.  Mr. Booker, I believe, took efforts to determine whether

24  the victim was under 18.  And I believe that was his practice

25  for not necessarily altruistic reasons — although I think that

1    was part of it — but it was his practice just for his own

2    self-preservation.  He knew the penalties that were associated

3    with dealing with minors.  He admitted this during his debrief

4    last week, that he would take efforts to determine whether

5    someone was a minor by asking them questions about their

6    families, asking them if there was anyone looking for them,

7    asking them if they were runaways, and if that were the case he

8    would no longer deal with that person.

9            Some of the Internet sites that Mr. Booker was dealing

10   with would require a form of identification.  So it wasn't

11   necessarily his business or it wasn't necessarily beneficial to

12   his business to deal with minors, and he avoided it.  He tried

13   to avoid it.

14           And I think that is why the first question presented

15   to "Sapphire" here is, "How old are you?"  Or at least one of

16   the first questions was, "How old are you?"  And the fact that

17   it was asked so many times certainly can be seen as some doubt

18   on the part of Miss Arnold and Mr. Booker, also can be seen as

19   going above and beyond what maybe they would normally do to

20   verify the age.  They weren't necessarily satisfied with the

21   first answer.  I don't think that shows that they then just

22   ignored it.  They tried to -- they tried to gauge it a little

23   further by asking her additional questions or asking her

24   repeatedly what her true age was.

25           So I think it's reasonable to infer that Mr. Booker

1    did not know that "Sapphire" was under 18 and, because of that,

2    that is another basis for varying from the guideline range.

3         Also, I think relative to the 3553 characteristics or

4    factors are Mr. Booker's characteristics.  And he does have some

5    positives, I think, contrary to the government's statement to

6    that effect.  Mr. Booker, for whatever he has done in his past,

7    his children love him and he has been a good father according to

8    all reports.  And it certainly is -- I mean, it's an unusual

9    situation in that I think Mr. Booker would acknowledge he was

10   leading almost two lives.  Perhaps his family was ignoring what

11   was going on in his other life, but in his family life he would

12   attend all of his kids' school functions.  His long-time

13   girlfriend, Precious Richards, is in court today and she would

14   like to address the court, but she was pleased with him as a

15   father.

16        I think another ironic aspect to this case is the fact

17   that Miss Richards works at Meta House which is a facility for

18   women often who are prostitutes.  And it certainly -- I don't

19   know exactly what it means, but it's ironic and I think it says

20   something about Mr. Booker that a woman who works with women who

21   are trying to get away from prostitution also sees something in

22   Mr. Booker as a father and as a boyfriend to her.  It says

23   something that Mr. Booker is not necessarily I think the --

24   somewhat of a monster that the government is portraying.

25        And so, I think for all of these reasons a 120-month

1  sentence is certainly sufficient but not greater than necessary

2  to achieve the purposes of 3553.

3          As I said, Miss Richards would like to address the

4  court and Mr. Booker would also like to address the court.

5          THE COURT:  All right.  Miss Richards, if you'd like

6  to be heard you may please come forward and use the lectern.

7          MS. RICHARDS:  Sorry.  Hello.  Can I first just read

8  --

9          THE COURT:  Can you state your full name, please.

10         MS. RICHARDS:  I'm sorry.  Precious Richards.

11         THE COURT:  Go ahead.

12         MS. RICHARDS:  Can I first just read two letters that

13  my kids wrote in regards to --

14         THE COURT:  You may.

15         MS. RICHARDS:  This is from his nine-year-old

16  daughter.  She said:  "Dear Judge, I would like for my daddy to

17  come home because he is a great parent and I really love him so

18  much."

19         Sorry.

20         THE COURT:  That's okay.

21         MS. RICHARDS:  "He is the love of my life.  He shows

22  me all the respect he can show.  He takes me places I want to

23  go.  I really love my daddy."  She had that in bold.  "He makes

24  me smile and laugh.  Without him I can't live.  So can he please

25  come home?  He treats me as if I'm the only child.  Please give

23

1  my daddy the honor to come enjoy his life.  Let me enjoy being

2  with him for the rest of his life.  He will be a great father

3  and I promise -- promise not to be mad anymore."

4        And this is from his son:

5        "I am a stepson of Amani Booker.  I really want my

6  step dad to come back because it's not only hard for my sister,

7  it's hard for me.  She has a dad but to me I really want him to

8  come home because my father really wasn't there for me half of

9  the time but Amani was there for me.  Like, for example, he was

10  there for all my birthdays, Christmas concerts.  He's been there

11  for me all this time.  I love him so much.  He's a great father

12  to me.  And I would love it if you could just give him another

13  chance.  He will be a great father and a stepfather.  I want to

14  have a great father like him."

15        And I just wanna say that in regards to his situation

16  that like it seems like -- sorry -- they focus a lot on his past

17  and the things that he's done to get his self in the criminal

18  system, but he is really a positive person when he's around

19  kids.  And he has -- I mean, he's always been a person of his

20  word.  And like, him being in here, we talked about whenever the

21  outcome of this situation when he does come home what we will do

22  from this point as a family to make sure that this situation

23  doesn't happen again.  And it's not really -- the sentence

24  doesn't really just affect him, it affects me and the kids.  And

25  Amani knows that whatever the outcome of this situation we'll be

24

1  there for him.  Just know it's really difficult.  And I really

2  wish that, you know, you know, that could be tooken into

3  consideration when it comes to his sentencing today.

4        I appreciate you listening to me, too.  Thank you.

5        THE COURT:  I appreciate your comments.  They

6  certainly provide a different perspective concerning Mr. Booker.

7        Mr. Booker?

8        THE DEFENDANT:  Your Honor, I just wanna say that, you

9  know, I know I made a lot of bad decisions in my -- in my life,

10  and I'm hurting a lot of people right now.  Something -- I mean,

11  there's something that makes me make bad decisions that I just

12  don't think that, you know, that it could lead -- that it

13  eventually lead to this.  My mother and my parents been telling

14  me this a long time ago that, you know, these negative decisions

15  always lead to, you know, something negative in return.

16        I just happened to always, you know, look for the

17  fastest way that I could be able to take care of things.  And,

18  you know, I guess basically I had to learn everything the hard

19  way.  That, you know -- you know, that I hurt more than myself

20  just by making all of these bad decisions that I made with my

21  life.

22        And I'm 35 years old.  And, you know, this is my last

23  opportunity to make something -- you know, at least to make

24  something of myself so my son don't follow in my footsteps and

25  my daughter follow in my footsteps and going in the same

Case 2:10-cr-00133-CNC   Filed 03/08/11   Page 25 of 35   Document 81

1    direction in they life.

2         And, you know, basically I just want Precious to know

3    that I'm sorry and, you know, that everybody involved with this

4    case that I'm sorry about, you know, the decisions that I made

5    with my life.  And I'm here to accept responsibility, you know,

6    for everything that I've done in my life that's been so negative

7    on everybody else.  You know.

8         And I just want an opportunity, you know, to show them

9    that I'm really not a bad person.  I just sometimes -- you know,

10   I just sometimes, you know, doing things as easy as I can.  And

11   easy don't never turn out good.  And seems like I gotta learn

12   that the hard way.  The easy never turns out good.

13        THE COURT:  Mr. Booker, I have to say that what I

14   heard today comes off as the story of two Amani Bookers.  Your

15   girlfriend and your children have been exposed to some very good

16   things, the positive side of you.  Your co-defendant and the

17   child victim of your prostitution related activities have seen

18   someone else.

19        You've shown caring and concern of a parent for your

20   daughter, yet you showed something quite different to someone

21   else's daughters.  You have used and abused women and at least

22   one child.  You have demeaned those women and child, and you

23   have taken advantage of their services for your benefit and for

24   your financial well-being.  You have placed women and the child

25   victim in this case at risk for physical harm as well as medical

1    harm, and you have engaged in a pattern of utter disregard for

2    the law.

3         The community needs to know -- and other men who might

4    think of engaging in prostitution activities by enlisting women

5    to engage in sexual activity for money should know -- that there

6    is a cost, a tremendous cost that will be paid for violating the

7    law.  A slap on the wrist and a nod are insufficient.  The

8    penalty for your criminal conduct must be substantial in order

9    to deter you from engaging in future criminal activity, and

10   certainly for the purpose of deterring you from engaging in

11   further prostitution related activities.

12        The penalty should also deter others.  General

13   deterrence, as Mr. Wall has suggested, is important, and that is

14   one of the underlying reasons for our criminal law and for

15   sentencing generally and sentencing in this case in particular.

16   18 U.S.C. Section 3553(a)(2) requires me to do that, and to take

17   all of that into account.

18        I have weighed the facts and circumstances of this

19   case and have noted that the child who was enticed to engage in

20   prostitution here was 14 years old.  While the doctor who

21   submitted his report suggests that it might be difficult to tell

22   from looking at her whether she was 14 or older, what you and

23   Miss Arnold said and did suggests strongly that you didn't think

24   she was 18.  In fact, in my view you knew she was not 18.  You

25   quizzed this child about her age.  Miss Arnold did also.

27

1       Miss Arnold noted how inappropriately she was dressed

2   when you and Miss Arnold approached this child on the street at

3   about 1:30 in the morning, as she was clearly soliciting

4   business on the street corner.  You and Miss Arnold schooled

5   this child and made it clear to her that what she was selling

6   for $50 could be sold for a lot more.  You humiliated this young

7   woman and exposed her to the world by taking photographs of her

8   and posting them on the Internet so the world can see.  Her

9   privacy was at that point shot, eliminated, perhaps for all

10  time.

11      It's, therefore, the conclusion of this court that a

12  120-month sentence as requested by your counsel is not

13  sufficient.  On the other hand, considering what the government

14  has noted, and in particular the responsibility you've taken in

15  connection with this case, a sentence less than the maximum is

16  certainly appropriate.

17      Mr. Wall has requested that the court impose a

18  168-month sentence.  And when I take into account all of the

19  factors that have been set out in this record, I concur.  Such a

20  sentence is no greater than is necessary under the

21  circumstances.  It's reasonable, yet exacts the right amount of

22  punishment with due regard for your incarceration prior to this

23  case, in this particular case, as well as other sentences that

24  have been imposed.

25      When you have completed this sentence you're to serve

28

1   a five-year term of supervision, and during your supervision

2   you're to comply with the standard conditions which have been

3   imposed by this court.  And let me also add you're not to

4   violate any federal, state, or local laws.

5           Additionally, the following applies:

6           1.  You're to report within 72 hours of your release

7   to the probation office in the district where your release

8   occurs.

9           2.  At no time may you possess a firearm or ammunition

10   for a firearm.  If you do, an additional period of incarceration

11   shall ensue.

12           Third.  You may not possess any controlled substances

13   illegally.  That also means you can't use any illegal controlled

14   substances.  If you violate this term of your supervision, you

15   will also go back to jail.

16           If you have not to date submitted a sample of your

17   DNA, you are to submit a sample immediately or as soon as a

18   request for your DNA is made.  If for some reason you're DNA has

19   not been collected prior to your release, you're to submit a

20   sample of your DNA at the direction of your supervising

21   probation officer.  If you fail to do so you will again be

22   subject to further incarceration.

23           The court further directs that you participate in a

24   program of testing to include not more than six urinalysis tests

25   per month, and residential and/or outpatient treatment for drug

1  abuse as approved by your supervising probation officer.  During

2  your supervision you may not use alcoholic beverages to excess.

3          While on supervision -- and this takes into account

4  the discussion earlier regarding your income and taxes -- you're

5  not to open any new lines of credit or use any existing lines of

6  credit or lease any personal property without the prior approval

7  of your supervising probation officer who is to have access to

8  your personal financial information, including your federal and

9  state income tax returns, which returns are to be timely filed

10  and provided to your supervising probation officer immediately

11  after they are filed.

12          Please note that the conditions of your supervision in

13  this district -- perhaps they are different in another district,

14  but within this district your monthly financial reports are due

15  within five days of the beginning of each month.  Failure to

16  submit these reports and failure to truthfully complete the

17  reports will subject you to an additional period of

18  incarceration.

19          You have familial responsibilities and, therefore, you

20  are to cooperate with the child support enforcement unit in the

21  payment of any child support or arrearage and make regular

22  payments of child support as directed by your supervising

23  probation officer.

24          Because this offense involved a minor, you are not to

25  have any contact with children under the age of 18 unless

1  approved in advance in writing by your supervising probation

2  officer, and then only in the physical presence of a responsible

3  adult who has been advised of this conviction.

4        If you have inadvertent contact with a minor contrary

5  to these conditions, within eight hours you are to report that

6  inadvertent contact to your supervising probation officer.

7  Please also know that you are to register as a sex offender in

8  accordance with applicable law.

9        The Mandatory Victims Restitution Act, Title 18,

10  Section 3013 also dictates that you pay a special assessment.

11  As I indicated earlier, that sum is $100.  It is payable

12  immediately to the Office of the Clerk of Court in room 362 of

13  this building.  If you do not have the ability to pay that at

14  this time or prior to reporting to the institution or

15  institutions designated in this case, you're to participate in

16  the Bureau of Prisons Inmate Financial Responsibility Program as

17  a necessary part of this payment obligation.  If any portion of

18  the special assessment remains upon your release, the balance is

19  to be paid at a rate of not less than $10 a month commencing 60

20  days following your release from custody.

21        I add this to your conditions of release and your

22  judgment of conviction in recognition of difficulty -- of

23  difficulties that defendants often have securing employment and

24  the need to give defendants an opportunity to gain some -- or I

25  should say realize some cash flow.

1    If you take issue with your conviction and believe

2  that there was a fundamental defect in the proceeding which was

3  not waived by your guilty plea or otherwise waived as part of

4  your plea agreement in this case, or, on the other hand, if you

5  believe the court has imposed an illegal sentence or a sentence

6  that is contrary to law, you may appeal.  If you wish to appeal

7  you can indicate that on the record before you leave the

8  courtroom today and the clerk will file your notice of appeal.

9    Alternatively, you will have 14 days after the

10  judgment of conviction has been docketed to file a notice of

11  appeal.  You may do that with the assistance of your counsel, or

12  you may do it without his help.  Regardless of how an appeal is

13  initiated, Mr. Mullins is required to represent you in the

14  appellate court and in the preparation of the documents unless

15  or until the court of appeals states otherwise.

16    At this juncture the court is not imposing a fine and

17  further determining that you qualify to appeal in forma

18  pauperis, that is, without the payment of the usual filing fee.

19    What is your desire?  Do you wish to appeal?

20    THE DEFENDANT:  No.  I would like to speak with my

21  lawyer at a later date before I make that decision.

22    THE COURT:  Very well.  Mr. Mullins, I trust that you

23  will file an appropriate statement verifying your consultation

24  with your client and the decision which has been reached.

25    MR. MULLINS:  I will, Your Honor.

Case 2:10-cr-00133-CNC   Filed 03/08/11   Page 32 of 35   Document 81

1          THE COURT:  Is there anything else from the defense?

2          MR. MULLINS:  Just a couple of things.

3          THE COURT:  Surely.

4          MR. MULLINS:  We would ask for a recommendation that

5    Mr. Booker participate in the 500-hour drug treatment program.

6          THE COURT:  I will include that in the judgment.

7          MR. MULLINS:  And placement as close to Milwaukee as

8    possible.

9          THE COURT:  That too will be included.

10          MR. MULLINS:  Thank you.

11          THE COURT:  Is there anything on behalf of the

12   government?

13          MR. WALL:  No, Your Honor.  Thank you.

14          THE COURT:  One second, please.

15          Mr. Fetherston?

16          PROBATION OFFICER:  Nothing, Judge.

17          THE COURT:  Very well.  I wish you well.

18          Let me just add one thing, Mr. Booker.  Your children

19   have indicated that they're going to miss you and that they

20   appreciate the things that you've done for them.  Write them.

21   Get involved in the prison industries.  Do something that will

22   give you some income -- legitimately, of course, within the

23   laws -- so that you can contact your kids, obtain commissary

24   goods, and show them through your writing and communications,

25   other than collect calls that are very expensive, that you care.

1  In that way you can continue to participate meaningfully in

2  their lives and bring some good to an otherwise negative

3  situation.

4          Make the best of the circumstances you have and try to

5  counsel your kids in a way that helps them to appreciate the

6  things that they have and encourages them to get a good

7  education and to be the best that they can possibly be.

8          We stand in recess.

9          THE BAILIFF:  All rise.

10          (Audio file concluded at 2:42:52 p.m.)

11                      *    *    *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF WISCONSIN

3

4            I, JOHN T. SCHINDHELM, RMR, CRR, Certified Transcriber

5    for the United States District Court, Eastern District of

6    Wisconsin, do hereby certify that I transcribed the foregoing

7    audio file, and that the same is complete and accurate to the

8    best of my ability and in accordance with the audio file as

9    provided to me.

10   Dated this 8th day of March, 2011.

11   Milwaukee, Wisconsin.

12

13   _____
     Official Court Reporter

14   United States District Court

15

16

17

18

19

20

21

22

23

24

25